UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X Civil Action No. 17-3892
ROYAL FOOTWEAR AND ACCESSORIES, LLC,

        Plaintiff,

-against-

SELDAT, INC., SELDAT DISTRIBUTION,
INC. (CA entity), SELDAT DISTRIBUTION,
INC. (NJ entity), SELDAT LIMITED
LIABILITY PARTNERSHIP, SELDAT
DISTRIBUTION CORPORATION, SELDAT
TRANSPORTATION INC., SELDAT CORPORATION,
DANIEL DADOUN and ABC CORP.,

        Defendants.
------------------------------------X

PLAINTIFF'S DECLARATION OF LEN BERNSTEIN IN SUPPORT OF APPLICA-
TION FOR A PRELIMINARY INJUNCTION

    I, declare, under the penalty of perjury under the laws of the United States of America, that the following is true and correct:

    1.   I am the President of the B-Biz Solutions, Inc., an independent consultant hired to analyze and make recommendations regarding financial operations of a companies often by lenders of those companies. I have approximately 30 years of experience in analyzing the financial operations of companies in the clothing business like plaintiff including working at factors and asset-based lenders. I submit this declaration in support of plaintiff's application for a preliminary injunction and specifically to respond to the Court's statement in the May 26, 2017

Order that "the Court has serious concerns about whether the threatened harm is irreparable." As set forth more fully below, if the preliminary injunction is not granted, plaintiff will suffer irreparable harm.

2. I was first introduced to plaintiff in June, 2016, by Merchant Business Credit in order to provide plaintiff assistance with its financial and cash flow practices in order to eliminate a serious over-advance with their lender, Merchant Business Credit (the "Factor"). At that time in June, 2016, the "over-advance," namely, borrowing exceeding collateral, was at an unacceptable level and plaintiff was directed by the Factor to eliminate the over-advance quickly and permanently. Managing the over-advance and cash management was assigned to me as my primary function at the plaintiff. As part of my duties while working with the plaintiff from June, 2016 until the present, I was given full access to the books and records of the plaintiff. I have a full understanding of its business operations. I am fully familiar with the facts and circumstances relating to this action.

3. Plaintiff borrows from the Factor based upon a collateral comprised of 90% of Accounts Receivables and 50% of Inventory. The amount of the loan available from the Factor is constantly changing based on the amount of the collateral calculated by this 90%/50% formula. If the loan exceeds this collateral amount, then plaintiff is in an "over-advance position" (also

2

known as "out of formula"). Once a company is in an over-advance position, there are additional charges to the Factor, including additional over-advance interest charged to the company. As inventory is sold, it moves from a 50% collateral component to the accounts receivable that is assigned the 90% collateral component. (See Exhibit A, email dated June 5, 2017 from the Factor confirming the plaintiff's 50%/90% agreement with the Factor). This increases the collateral amount and lowers the over-advance amount. Then, when an invoice is paid by a customer (typically 60 days after delivery), 100% of the customer's payment reduces the loan amount thereby reducing the over-advance further. If there are errors in shipping, delivery, routing, scheduling, quality, packing, or handling, the customer will take a chargeback from their payment or will request an allowance (which is also called a chargeback) thereby reducing the amount of the customer's payment which in turn does not reduces the over-advance as much as if there had been no chargebacks. If the over-advance does not decrease within a reasonable amount of time and put the company "in formula," the Factor will require the borrower to put up personal funds as additional collateral that is then held to help offset the over-advance. If no such personal funds are available, then the Factor will call in the loan.

4. Money is borrowed from a factor for two primary reasons: (1) in order to pay the factories manufacturing the company's products and (2) in order to pay for operating overhead expenses. When sales are reduced or chargebacks are incurred, this reduces the cash available needed to pay the factories and operating expenses. When this occurs, the company will contact the factories and its suppliers to request extensions and additional terms to push out payments until the time when the borrowing is back "in formula."

5. When inventory does not sell as planned, the Factor then will place a reserve on the labeled "slow moving inventory" and remove it from the collateral formula thus increasing the over-advance and reducing the cash availability needed to pay factories, suppliers and overhead expenses. Ideally, the faster the inventory sells, the better the borrowing position will be. In this specific case with plaintiff, the inventory held by defendants has been removed from the collateral held by the Factor because plaintiff cannot sell or ship it and the inventory is not in plaintiff's possession or control.

6. The inventory's value of $778,392.87 has been removed from the Factor's collateral formula resulting in a loss of collateral of $389,196.43 (i.e., 50% of the inventory's value). The over-advance is now higher by $389,196.43 and plaintiff cannot borrow this money it normally would to use for payments to

4

the factories and suppliers. The $389,196.43 is urgently needed to pay installments to factories for ongoing production to ensure timely delivery and to pay normal operating expenses (e.g., Freight, Duty, Customs, Logistics, Trucking, Rent, Payroll). If any of these expenses are not paid timely, the entity owed money by plaintiff can shut down plaintiff's chain of operations because any broken link in the chain breaks the entire chain. Once the inventory held by defendants is transferred into plaintiff's possession, the inventory can be sold and shipped to customers which will then pay plaintiff more than $1 million for the merchandise. Based upon the Factor's collateral formula, this translates into availability of over $900,000 (90% of Accounts Receivable) which can be borrowed in order to pay factories and suppliers to bring plaintiff to "in formula" and guaranteeing a successful fall season.

7.  The dire financial situation that now exists at plaintiff is a direct result of defendants' inability to ship orders, incorrect handling and shipping of orders and poor inventory management. This led to sales goals not met in timely manner and to customers not only reducing their payments, but also refusing to place re-orders within season or additional orders. This then resulted in the over-advance not decreasing as projected thereby decreasing the cash available to borrow in order to pay for future inventory as well as other operating expenses.

In fact, the only reason that plaintiff has been able to continue in business at all is that the sales in the first quarter of 2017 were from inventory that was brought in on credit to a different company from the defendants' warehouse business. That company correctly warehoused plaintiff's inventory and then it shipped properly and timely to customers. Only the inventory held by defenants was unavailable to be shipped to plaintiff's customers resulting in sales shortages. However, payment for this new inventory must now be made to the factories or the factories will not continue to work on production or ship new purchase orders. With the release of inventory held by defendants, plaintiff can immediately borrow funds against it and make payments to satisfy the factories.

8. Plaintiff does not work on Letter of Credit or Direct Payment terms. Plaintiff's factories are all in China. Based upon my experience and knowledge of this type of business, plaintiff's factories extend generous credit terms to plaintiff above what is typical in the industry. However, when payments are not made timely to a factory by plaintiff, this generates a strain on the factory's finances and credit. In addition, in order to protect their businesses, the factories purchase credit insurance similar to what banks and factors do in the U.S. by using an Asian credit company, Sinosure. Sinosure monitors the credit and payment history from plaintiff to its various facto-

ries. The amount of credit extended to the factories insuring plaintiff's purchase orders is dependent upon this transactional history.

9. During the 7-month span that plaintiff utilized defendants' services (June, 2016 to January, 2017), (1) sales orders were not shipped properly, timely or at all, (2) chargebacks were astronomical as a result of improper handling by defendants and (3) there was never an accurate accounting of the inventory that was received or shipped out of their facility. This resulted in the following:

    1. **Sales goals were not reached**. This put a strain on the over-advance situation that was already not in a good position. Cash became tighter than expected so promised payments could not be met forcing plaintiff to ask for additional extensions from factories and suppliers.

    2. **Dilution**. "Dilution" is a term of art in the factor business that refers to budgeted and actual decreases in the total amount billed in invoiced. Due to the chargebacks incurred for incorrect shipping, late shipping, incorrect handling, EDI Violations, routing violations, packing errors, and handling errors, among other things, plaintiff's dilution amounts increased dramatically thereby reducing the accounts receivable further and increasing the over-advance position. This, in turn, reduced the cash available to borrow money need-

ed to pay factories and other expenses. Dilution history at the plaintiff has been approximately 4% annually. Dilution is budgeted by plaintiff at 4.5% as a precaution and to be conservative. In the first 4 months of 2017, dilution has come in at 8.3% translating to a loss of cash availability of $126,122.

3. **Late Shipping**. The defendants' late shipping pushed out the customer invoices paid based upon receipt of goods, not date shipped, thereby delaying the potential reduction of the over-advance and delaying the ability to borrow to meet scheduled payments.

4. **Complaints by plaintiff's factories**. The factories that plaintiff orders its merchandise are complaining more than ever as their payments were pushed out further and further creating a valid concern that the plaintiff was in trouble. This then led to resistance in the factories' starting the production of new purchase orders for the upcoming new seasons. This then leads to delays in production completion making it impossible to ship upcoming orders on timely basis.

5. **Sinosure's Monitoring**. Sinosure is noting the late payments and the factories' concerns and will not increase or provide additional credit to the factories requesting credit lines as the existing credit lines are tied up due to delays and cannot be reduced until payments free up the credit.

6. **Late Payments to Suppliers**. All other suppliers of the plaintiff are being pushed out later and later making it difficult for the company to obtain beneficial rates and prices for all other services required to operate the business.

7. **Plaintiff's Costly Outreach to Unsatisfied Customers**. Plaintiff has been forced to send representatives not only to customers to apologize for all the delays, mistakes and short shipments so not to lose future orders, but also to China to appease the factories and ensure them that they will be paid. In fact, Habib Roy Cheika, owner of plaintiff, was forced to make a trip to China on April 30, 2017, when his wife gave birth to his daughter that morning at 2am. He arrived in China on May 2, 2017 and then departed China on May 4, 2017. He was forced to make this trip and incur extraordinary expense to spend 2 days to meet with the factories to beg them to bear with him and guaranty their payment. Plaintiff is in an emergency mode thanks to defendants' misconduct requiring desperate measures to keep operating.

8. **Plaintiff's Reputation is Nosediving**. Plaintiff is seeing a bombardment of email from the factories in China including stop action threats and questions concerning plaintiff's ability to remain in existence.

9. **Plaintiff's Licenses Are At Risk**. Plaintiff possesses licenses from companies with well-known brands requiring

royalty payments based upon certain sales figures. However, in spite of the reduced sales, the royalties have annual minimum payments required whether the license product is sold or not. In the past, reaching the minimum sales figures has never been a problem with plaintiff but without the ability to sell the inventory in defendants' possession, plaintiff will be forced to pay for unachieved sales.

10. The inability to ship or utilize the existing inventory creates a negative chain reaction or domino effect that directly affects the finances and the ability of plaintiff to remain in business.

11. The emergency need for the inventory presently held by defendants is for the following reasons:

    1. The selling period for this inventory begins in June. This is the time to sell inventory that is not specifically designed for specific customers. June, July and August are the months in which fall inventory is sold without having to drastically reduce price. Plaintiff needs to turn this inventory into sales immediately in order to generate more collateral for the Factor. Because the inventory has already been held by defendants for one season, the inventory is now second season merchandise. If the inventory is not sold this season, then the value of the merchandise drops to almost nothing making it worthless as collateral. In addition, the projected sales, pro-

vided to the Factor, rely on these sales to reach plaintiff's projected figures. Plaintiff will have some sales from existing inventory held at other warehouses, but, in order to generate the sales to reach the projections, the inventory held by defendants is crucial. May, June, July and August are historically "stocking up" months prior to the fall shipping which is the heart of the business of plaintiff. The inventory held by defendants translates to approximately 9% of the total annual sales of the plaintiff. But the advances borrowed against the accounts receivable (approximately $900,000) is critical to pay for the fall shipping season which is approximately 60% of the total annual sales. If any of the fall sales are jeopardized or late resulting from delayed payments, the plaintiff will not survive.

2. Since plaintiff was not paid by customers for the shortages shipped by defendants, the previous sales became overstated and this appears in the chargebacks. This shorted inventory is now being held by defendants and it can be sold now for fall and holiday season as it was supposed to ship from November, 2016 to January, 2017. Plaintiff can still salvage the inventory for 2017 if plaintiff has in possession with an accurate count.

3. Presently, because the inventory is being held by defendants and because plaintiff does not have accurate invento-

ry count as it was never provided by defendants, plaintiff cannot attempt to sell to its customers as it cannot sell what it is not 100% sure that it can ship. Once plaintiff retrieves the inventory from defendants, plaintiff can make an accurate count of the inventory. If customers cannot get what they want from plaintiff, they will turn to its competitors and there is no guaranty they will return to do business with plaintiff.

4. Due to the need to generate cash desperately, plaintiff will have to attend the "Off Price Show" in Las Vegas that is in August, 2017. First, this will incur additional costs of attending the trade show due to travel and fees charged by the trade show. Second, in order to attend the show, plaintiff requires the inventory held by defendants in plaintiff's possession to truly understand how much is there and the condition of all the merchandise and to obtain samples of the merchandise to in order have a proper sales strategy for the show. In order to conduct a successful trade show in August, 2017, the preparation work for the show needs to begin immediately.

5. The Factor has stated that if plaintiff falls "out of formula" this year, the Factor will request additional collateral committed by the Owner. There is already collateral in place but that will not be enough. At this time, the plaintiff has no other equity or holdings that can be used to provide the Factor with additional collateral. If no other collateral

is provided, then the loan will be called and plaintiff will cease doing business.

6. Plaintiff's factories in China are frantic at this time, calling and emailing on daily basis. They are threatening to stop all production of new orders needed for timely delivery this fall. They are also threatening to complain to Sinosure which will result in a credit reduction making it impossible to place orders for the upcoming seasons.

7. Again, the inventory held by defendants has been removed from the company's inventory recognized by the Factor. It is being held in a reserve that does not count towards the borrowing collateral. Advanced cash, traditionally used against this inventory, is not available for use to ensure that ongoing production will be completed timely. In addition, if the inventory in defendants' possession is not sold and delivered over the next 2-3 months, the sales value of the inventory will drop dramatically rendering the inventory worthless.

8. The state of emergency at plaintiff is real and very serious. With the inventory in plaintiff's possession, plaintiff can verify the inventory counts and begin to sell the inventory immediately with sales orders for shipping over the next few months. With sales orders in place and with the knowledge that inventory exists to ship these orders, the Factor will be appeased on a temporary basis which will free up availa-

ble cash. The reserve will not be needed as plaintiff will be able to provide orders for the "slow moving inventory" to show that a reserve is not required. Plaintiff will be able to pay the factories and expenses to re-establish credibility and ensure that future production will be done timely.

12. Plaintiff is a company with annual gross sales revenue of approximately $12 million. The wholesale value of the inventory based upon the last provided quantities is over $1 Million representing almost 9% of the annual sales. If the injunction is not granted to provide immediate access to the inventory, I reasonably foresee the following:

1. Plaintiff will not be able to achieve their sales projections for the Factor resulting in a demand for the call in of the loan.

2. Without the inventory and the subsequent sales attributed from sale of the inventory, the factories will not be paid pursuant to the promises made by Mr. Cheika on his last China trip on May 2-4, 2017. There will not be enough inventory to sell in the fall season, the Christmas holiday season and next spring season. Again, this loss of sales will push the company far "out of formula" and the factor will call in the loan.

3. Without the $1 million from the sale of inventory, which includes licensed goods, plaintiff will not be able to meet their minimum sales figures with their licensors. This will

cause the licensors not to renew the licenses for another term. Without these licenses, sales will drop below levels acceptable to the Factor which will lead to the loan being called in.

    4.    The inventory in defendants' possession has been fully paid for and the sale of this inventory will only directly affect the accounts receivable and available cash as well as cause a reduction of the loan. No borrowing is necessary to turn the inventory into a reduction of the over-advance. A reduction of the over-advance is an absolute necessity at this time in order to keep the loan "in formula" and at a level where borrowing can take place to continue to pay the factories and operating expenses. Without sale of the inventory now, the loan will not stay "in formula" and will not be reduced. As a result, the Factor will not advance further funds and factories will not be paid. Again, this will push plaintiff "out of formula" and the loan will be called.

    5.    Without plaintiff's possession and sale of the inventory, the over-advance will remain higher than projected resulting in the extra penalty interest charges by the Factor for the over-advance position. This extra cost was neither foreseen nor projected and plaintiff's profitability will decrease as well as the available cash which will be deducted by the Factor to cover the additional interest. Furthermore, the reduced profitability will reduce the potential profit for the

calendar year forcing the company into a violation of the equity covenants in the Factor agreement. This violation will also come with a substantial financial penalty that, again, will decrease cash availability and lead to the loan being called.

13. The main issue is that this inventory has been paid for but it is needed to turn into cash or accounts receivable immediately in order to maintain the cycle of the borrowing base cash flow as permitted by the Factor's collateral formula. The sales from this inventory will generate credit and cash availability needed to purchase and pay for future seasons' inventory. The additional urgency is that, due to defendants' failure to ship the merchandise while in season, the merchandise is now considered second season merchandise which if sold now can still be sold for over $1 million. Plaintiff can then prepare for the August, 2017 "Off Price" trade show to sell anything that is left over and clean out the entire inventory. Time is of the essence because June is the sales period when wholesalers sell to retailers for the fall and winter sales seasons. Without the sales of this inventory now, plaintiff will be put out of business.

14. Exhibit B is a summary of plaintiff's business records that I created showing actual and projected sales and expenses and "out of formula/in formula" parameters with the Factor. Row 42 row entitled "net availability" shows whether plaintiff is in

or out of formula. A negative number means plaintiff is "out of formula." A positive number means plaintiff is "in formula." Exhibit B shows that, if plaintiff cannot immediately sell the inventory being held by defendants, plaintiff is projected to be $1,297,504 "out of formula" as shown by the cell at row 42, column Z. However, if plaintiff is immediately able to sell the inventory being held by defendants, plaintiff is projected to be $319,163 "in formula." (Ex. B, cell at row 42-column Y).

15. Plaintiff runs its business in a calendar year cycle. As shown by the columns pertaining to actual and projected expenses from January to June, plaintiff will typically be close to "in formula" in January and then uses the Factor's loan to pay for manufacturing and shipping merchandise to the U.S. in January and runs the loan up to approximately $1 million "out of formula" by April. Over the rest of the year, plaintiff pays off the loan and gets it close to "in formula" by December. In my projection, plaintiff will be "in formula" by $319,163 by December, 2017 if it can sell the inventory held by defendants now. (Ex. B, see cell at row 42-column Y).

16. However, as my projections show, plaintiff will be "out of formula" by approximately $1.3 million by December, 2017 if plaintiff cannot immediately sell the inventory held by defendants! (Ex. B, see cell at row 42-column Z). As a result, the Factor will not permit plaintiff to run the loan "out of formu-

la" up to approximately $2.3 million by April of next year. (Again, plaintiff runs up the loan by approximately $1 million in January of each year). In that scenario, because plaintiff will be so far out of formula early next year, the Factor would call in the loan if it learns that this application for preliminary is denied. The reason for this is that plaintiff is currently approximately $1.6 million "out of formula" (Ex. B, cell at row 42-column N) and without any real hope of getting "in formula" if plaintiff cannot immediately sell the merchandise held by defendants. If the Factor calls in the loan, plaintiff will be out of business because it will have no money to manufacture merchandise.

Dated: June 5, 2017
New York, New York

_____
Len Bernstein